## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

NORTHSTAR TOWERS, LLC,

               Plaintiff,

v.

CITY OF NEWARK, OHIO; and
CITY OF NEWARK BOARD OF
ZONING ADJUSTMENT a/k/a
CITY OF NEWARK BOARD OF
ZONING APPEALS

               Defendants.

Case No.: 2:23-cv-3608

## <u>COMPLAINT</u>

The plaintiff, by its attorneys, Husch Blackwell LLP, for its Complaint against the defendants, alleges:

## NATURE OF THE MATTER

1. This action seeks relief from Defendants' unlawful denial of Plaintiff Northstar Towers, LLC's application for approval to construct a wireless communications tower on property located at 1155 North 21st Street, Newark, Ohio 43055.

2. Defendants have not provided a written basis for that denial.

3. Defendants' denial violates the federal Telecommunications Act of 1996 (TCA): it is not based on substantial evidence in the record and amounts to effective prohibition of enhanced personal wireless service.

4. Defendants' denial also violates Ohio state law because it was illegal, arbitrary, capricious, unreasonable, and unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record.

5. Northstar seeks declaratory, injunctive, and mandamus relief and requests that Defendants be ordered to approve Defendant's application and grant all necessary permits for zoning, construction, and operation of Northstar's proposed tower.

## PARTIES

6. Plaintiff Northstar Towers, LLC (Northstar), is a Delaware limited liability company authorized to do business in the State of Ohio, with a business address of 815 Superior Avenue, Suite 1425, Cleveland, Ohio 44114.

7. Defendant City of Newark, Ohio (the City) is a municipal corporation existing under the laws of the State of Ohio with an address of 40 West Main Street, Newark, Ohio 43055.

8. Defendant City of Newark Board of Zoning Adjustment a/k/a City of Newark Board of Zoning Appeals (the Board) is a duly created administrative board of the City of Newark with an address of 40 West Main Street, Newark, Ohio 43055.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it concerns federal questions arising under the TCA, 47 U.S.C. § 151 et seq., and specifically 47 U.S.C. § 332(c). This Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367 because the claim is part of the same case or controversy as the federal questions before the Court.

10.     This Court has personal jurisdiction over Defendants because they are governmental bodies located in the State of Ohio.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in Licking County, Ohio, which is located in this judicial district and division.

## REQUEST FOR EXPEDITED REVIEW

12.     Northstar requests expedited review of this action under 47 U.S.C. § 332(c)(7)(B)(v), which provides that "court[s] shall hear and decide [actions under the TCA] on an expedited basis."

## FACTUAL BACKGROUND

**A.      Federal law promotes the development of necessary wireless communications infrastructure.**

13.     Federally licensed wireless communications carriers work to provide commercial mobile radio services, personal and advanced wireless services, and other telecommunications services, as those terms are defined under federal law, including in the City. These carriers seek to facilitate the development of wireless telecommunications networks in keeping with the goals of the TCA and often employee entities such as Northstar to develop, construct, and manage their necessary telecommunications infrastructure, including towers.

14.     The TCA establishes a national policy to "make available, so far as possible, to all people of the Unites States, without discrimination . . . a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the

purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.

15.    To meet these policy goals, Northstar, a provider of wireless infrastructure, works with federally licensed wireless communications carriers to develop wireless networks which offer a myriad of wireless communications services to local businesses, public safety entities, and the general public. Wireless communications carriers work with infrastructure providers such as Northstar to create and maintain a network of digital "cell sites," each of which consists of antennas and related electronic communications equipment designed to send and receive radio communications signals.

16.    Unlike cellular services using analog-based systems, digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This allows wireless communications carriers to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data and imaging capabilities as well as voice mail, call forwarding and call waiting.

17.    Wireless devices utilizing all digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller, which subsequently routes calls throughout the world.

18.     To provide reliable service to a user, coverage from cell sites must overlap in a grid pattern resembling a honeycomb. If a wireless communications carrier cannot construct a cell site within a specific geographic area, it will not be able to provide service to its consumers within that area.

19.     Engineers from the wireless communications carriers use sophisticated, established industry standard computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located to provide and enhance service. The propagation study also considers the topography of the land, the coverage boundaries of neighboring cell sites, and other factors. For a wireless network to perform well, cell sites must be located, constructed, and operated so reliable coverage can be achieved. Only when the entire wireless network is operational will a mobile user have reliable service and uninterrupted communications throughout a given territory. If there is no functioning cell site within a given area, there will be no mobile wireless service for customers within that area, and mobile customers who travel into that area will experience an unacceptable level of mobile wireless service.

**B.      City of Newark Ordinances allow for the development of towers as conditional uses.**

20.     Under Part 12, Title IV of the City of Newark Ordinances (the Zoning Ordinance), the Board "shall have the power to hear and decide applications filed for conditional uses, special exceptions" and for decisions on other questions upon which it is authorized to act. Zoning Ordinance § 1234.07(c)(1).

21. In considering an application for a conditional use, the Board "shall give due regard to the nature and condition of all adjacent uses and structures, and in authorizing a conditional use, the Board may impose such conditions for the particular conditional use as the Board may deem appropriate for the protection of adjacent properties and the public interest." *Id.* § 1234.07(c)(2).

22. Under the Zoning Ordinance, the City is divided into categories of zoning districts. *See id.* Chapter 1238. One such zoning district is the GB-General Business District. *Id.* § 1262.01.

23. "[T]ransmission towers" are allowed in the GB – General Business zoning district as a conditional use. *Id.* § 1262.01.

24. No height restrictions exist in the GB – General Business zoning district. *Id.* § 1262.01.

**C. A significant gap in wireless service exists within the City.**

25. Cellco Partnership d/b/a Verizon Wireless and its affiliate entities (Verizon) maintain a wireless communications network across the country.

26. Verizon became aware of a significant service gap in its wireless communications network in the City. This service gap is located in and around the 21st Street corridor between Deo Drive to the north and Granville Road to the south (the Gap Area). Increased consumer demand for wireless service in the Gap Area has caused excess network traffic on the neighboring sites that provide coverage in the surrounding area. Verizon's existing telecommunications sites in and around the Gap Area can no longer provide adequate service to its customers there, which include residents and visitors to the area as well as emergency service providers.

27.     As a result of this significant service gap, Verizon customers using their devices in and around the Gap Area are likely to experience diminished call quality, slow and unreliable data transmission speeds, call drops, and blocked calls.

28.     Verizon's service gap in the Gap Area has existed for several years. This significant service gap will remain and cannot be resolved unless a communications tower is constructed within the Gap Area.

**D.     Northstar and Verizon identify a site for a new communications tower to resolve the significant service gap.**

29.     For at least the last two years, Verizon and Northstar have worked together to identify a property in the Gap Area that could accommodate a communications tower to resolve the significant service gap in Verizon's wireless communications network.

30.     Although Northstar initially looked for existing towers on which to place additional Verizon antennas, there were no suitable existing structures within Verizon's search area.

31.     Northstar then looked for suitable sites within and near Verizon's search area to construct a new communications tower.

32.     Northstar identified a property located at 1155 North 21st Street in Newark to construct a communications tower. The property is owned by The Kroger Company (Kroger Property).

33.     Northstar chose the Kroger Property after an extensive effort to identify a property owner who was willing to enter into a lease agreement for a property that

was located within the geographic area which met the coverage needs of Northstar's tower tenants, including Verizon.

34.    The Kroger Property is zoned "GB – General Business" per the City's zoning map, meaning Northstar needed to obtain a conditional use permit to construct a new communications tower.

### E.    The City denies Northstar's first application for a conditional use permit to construct a new communications tower.

35.    On or about February 1, 2023, Northstar submitted to the City an application for a conditional use permit to construct a 160-foot communications monopole-type tower and associated ground equipment within a 60-foot by 40-foot lease area on the Kroger Property (the Kroger Site 1 Application). A true and correct copy of the Kroger Site 1 Application is attached hereto and incorporated herein as **<u>Exhibit A</u>**.

36.    The tower proposed in the Kroger Site 1 Application would resolve Verizon's current significant service gap in the Gap Area, as described above.

37.    On February 23, 2023, the Board held a public hearing at which the Kroger Site 1 Application was considered. Jesse Styles appeared on behalf of Northstar.

38.    Per the official minutes of the February 23, 2023 public hearing, a copy of which are attached hereto and incorporated herein as **<u>Exhibit B</u>**, approximately three members of the public were present at the hearing and voiced their objections to the Kroger Site 1 Application. Their opposition was general in nature and not supported by any substantial evidence.

39. Mr. Layman, a member of the Board, commented that Northstar did not have enough votes from the Board for approval of the Kroger Site 1 Application.

40. After suggestions were made that Northstar should relocate the proposed tower elsewhere, Mr. Styles indicated that Northstar could not relocate the tower from the Kroger Property to another parcel. In the alternative, Mr. Styles asked if the Board would support the relocation of the tower to a new location on the Kroger Property, to which the Board did not directly respond.

41. Mr. Styles requested that the Kroger Site 1 Application be tabled by the Board in order for Northstar to "potentially comeback with a revised site plan, not an entirely new request." The Board subsequently passed a motion to table the Kroger Site 1 Application.

**F.  The City denies Northstar's second application—even after Northstar identified a less intrusive location.**

42. After the February 23, 2023 Board hearing, Northstar approached Kroger about relocating the tower on the Kroger Property. Kroger agreed to allow Northstar to relocate the tower. But Kroger did not want the tower on the north side of its property due to concerns with possible interference the tower might have with truck traffic affiliated with the Kroger grocery store on the Kroger Property.

43. On or about September 11, 2023, Northstar, through its attorneys, submitted to the City an application for a conditional use permit to construct a 160-foot communications monopole-type tower and associated ground equipment within a 60-foot by 40-foot lease area at a different location on the Kroger Property (the Kroger

Site 2 Application). A true and correct copy of the Kroger Site 2 Application is attached hereto and incorporated herein as **Exhibit C**.

44.     Kroger Site 2 is located approximately 600 feet east of Kroger Site 1, further away from residences and adjacent to Kroger's on-site gas station, a mini self-storage facility, and a Taco Bell restaurant. A mature line of tree grown along the southern boundary of the Kroger Property also serves as natural screening for Kroger Site 2.

45.     The tower proposed in the Kroger Site 2 Application would resolve Verizon's current significant service gap in the Gap Area, as described above.

46.     On September 28, 2023, the Board held a public hearing at which the Kroger Site 2 Application was considered.

47.     Jesse Styles of Northstar was present at the public hearing along with Northstar's attorneys. During the hearing, Northstar presented its new site plan and produced a written statement from a Verizon engineer showing a significant service gap in Verizon's wireless communications network (in the Gap Area) and setting forth the need for the Kroger Site 2 Tower. A copy of this statement is attached hereto and incorporated herein as **Exhibit D**.

48.     Approximately three members of the public voiced their opposition to the Kroger Site 2 Application. Their opposition was general in nature and not supported by any substantial evidence.

49. A member of the Board moved to approve the Kroger Site 2 Application. That motion was not seconded and therefore the Board could not vote on the Kroger Site 2 Application. Because the motion received no second, it was deemed denied.

50. To date, neither Northstar nor its attorneys has received anything from the City or the Board in writing setting forth the denial of the Kroger Site 2 Application.

51. To date, neither Northstar nor its attorneys has received any written reasons from the City or the Board to justify the denial of the Kroger Site 2 Application based on substantial evidence.

52. If Northstar is unable to construct the new communications tower, and Verizon is therefore unable to collocate its equipment on the proposed tower, the significant service gap in Verizon's wireless communications network will remain, and Verizon will be prohibited from providing reliable wireless service to its customers in the Gap Area.

## FIRST CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 332(c)(7)(B)(iii)
### Lack of Written Decision

53. Northstar restates and incorporates by reference the allegations above.

54. The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

55. In violation of the TCA, Defendants' denial of the Kroger Site 2 Application is not in writing. The Court must, therefore, assume there is no lawful basis for the denial.

### SECOND CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 332(c)(7)(B)(iii)
### Lack of Substantial Evidence

56. Northstar restates and incorporates by reference the allegations above.

57. The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

58. In violation of the TCA, Defendants' denial of the Kroger Site 2 Application was not supported by substantial evidence contained in a written record.

59. At the public hearing on the Kroger Site 2 Application, approximately three members of the public voiced their opposition. But their opposition was general in nature and not supported by any substantial evidence.

60. Unsubstantiated, unsupported opinion testimony of community residents does not constitute substantial evidence. *See T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 804 (6th Cir. 2012).

61. Similarly, "[g]eneral concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard are not sufficient." *Id.* at 800–01 & n.4.

62. Concerns about potential health risks and effects of radiofrequency emissions do not constitute substantial evidence and cannot be considered. *See id.* at

804. Indeed, "no state or local government or instrumentality thereof may regulate the construction of personal wireless facilities on the basis of the environmental effects of RF emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv).

63.    All told, Defendants' denial of the Kroger Site 2 Application was not based on any evidence and was not grounded in local, state, or federal law.

64.    To the contrary, the evidence in the record shows that Northstar complied with all applicable laws and was entitled to approval of Kroger Site 2 Application and a conditional use permit.

**THIRD CLAIM FOR RELIEF**
**Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)**
**Effective Prohibition of Personal Wireless Services**

65.    Northstar restates and incorporates by reference the allegations above.

66.    The TCA provides, in relevant part, that a state or local government or instrumentality "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

67.    If Northstar is unable to construct the new communications tower proposed in the Kroger Site 2 Application, Verizon will be effectively prohibited from providing reliable wireless service to its customers in the Gap Area.

68.    The Sixth Circuit adheres to "a two-part test to consider whether the denial of an application amounts to an effective prohibition: there must be (1) a showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *T-Mobile*, 691 F.3d at 805–06. Part (2) "require a showing that a good faith effort has been made to identify and evaluate less

intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." *Id.* at 808. "[T]he denial of a single application can constitute a violation of this portion of the [TCA]." *Id.* at 805.

69.     Northstar showed a significant gap in service coverage. As set forth in detail above, there is a significant service gap in Verizon's wireless communications network in the City (known as the Gap Area). The existence of this significant service gap is supported in the record by Exhibit D, the statement of a Verizon RF engineer.

70.     Northstar made an inquiry into the feasibility of alternative facilities or site locations. As set forth in detail above and in the record, Northstar made a good faith effort to identify and evaluate various sites and designs for a tower to resolve the significant service gap in Verizon's wireless communications network. This effort included searching for existing infrastructure on which to collocate additional antennas, assessing different properties to site a new telecommunications tower, and evaluating different locations on the Kroger Property both before and after the public hearing on the Kroger Site 1 Application. Northstar ultimately settled on Kroger Site 2, a less intrusive location away from residences and near a mature line of trees.

71.     In addition to violating the Sixth Circuit's test, Defendants' denial also violates the Federal Communications Commission's (FCC) interpretation of the TCA. On September 26, 2018, the FCC adopted a Declaratory Ruling and Third Report and Order, *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket Nos. 17-79 and 17-84, FCC 18-133

(FCC Ruling and Order), available at http://www.fcc.gov/document/fcc-facilities-wireless-infrastructure-deployment-5g. The FCC Ruling and Order went into effect on January 14, 2019. *See* Fed. Reg. Vol 83, No. 199, Monday, October 15, 2018, 47 C.F.R. Part 1.

72.     The FCC Ruling and Order clarified that under § 332(c)(7)(B)(i)(II), "an effective prohibition [of wireless services] occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service" including "not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving services capabilities." FCC Ruling and Order ¶ 37.

73.     In violation of the TCA, Defendant's denials of Northstar's applications effectively prohibited and materially inhibited Northstar and its tenants from filling a coverage gap and densifying a wireless network to address capacity needs.

74.     Under both the Sixth Circuit's test and the FCC Ruling and Order, Defendants' denial violated § 332(c)(7)(B)(i)(II).

75.     Defendants' failure to comply with the requirements of the TCA and their refusal to approve Northstar's applications has caused and will continue to cause Northstar irreparable harm.

## FOURTH CLAIM FOR RELIEF
### State Law Judicial Review

76.     Northstar restates and incorporates by reference the allegations above.

77.     Ohio Revised Code section 2506.01(A) provides for judicial review of "every final order, adjudication, or decision of any officer, tribunal, authority, board,

bureau, commission, department, or other division of any political subdivision of the state."

78.    Defendants' denial of Northstar's Kroger Site 2 Application is a final decision under section 2506.01(A).

79.    In a judicial review action, "the court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." Ohio Rev. Code § 2506.04.

80.    Defendants' denial of Northstar's Kroger Site 2 Application was illegal, arbitrary, and capricious, in that it violates federal law.

81.    Defendants' denial of Northstar's Kroger Site 2 Application was illegal, arbitrary, and capricious, in that it is unsupported by any reasoning.

82.    Defendants' denial of Northstar's Kroger Site 2 Application was unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record.

## PRAYER FOR RELIEF

WHEREFORE, Northstar respectfully requests that the Court:

A.    Conduct expedited review and disposition of this action under 47 U.S.C. § 332(c)(7)(B)(v);

B.    Issue an appropriate order directing Defendants to certify to this Court a true, full, and complete copy of the record of the acts and procedures involved in the denial of Northstar's Kroger Site 1 and Kroger Site 2 Applications so that this Court may review the data and records and adjudicate upon the legality of said proceedings;

C.     Declare that Defendants' denial of Northstar's Kroger Site 2 Application violated 47 U.S.C. §§ 332(c)(7)(B);

D.     Enjoin Defendants from denying Northstar's Kroger Site 2 Application;

E.     Enjoin Defendants to approve Northstar's Kroger Site 2 Application and to grant all necessary permits for zoning, construction, and operation of the communications tower proposed in the Kroger Site 2 Application;

F.     Issue a writ of mandamus directing Defendants to discharge all relevant duties to approve Northstar's Kroger Site 2 Application and to grant and issue all necessary permits for zoning, construction, and operation of the communications tower proposed in the Kroger Site 2 Application;

G.     Under Ohio Revised Code section 2506.04, declare that Defendants' denial of Northstar's Kroger Site 2 Application was illegal, arbitrary, capricious, unreasonable, and unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record;

H.     Under Ohio Revised Code section 2506.04, reverse Defendants' denial Northstar's Kroger Site 2 Application and issue an order directing Defendants to issue all necessary permits for zoning, construction, and operation of the communications tower proposed in the Kroger Site 2 Application;

I.     Issue an order reserving jurisdiction to this Court to resolve any issues between the parties as to further permit issues;

J.     Award costs and fees, including attorneys' fees, as may be available under law; and

K.      Award such other and further relief as the Court deems just and proper.

Dated: October 30, 2023

s/ Julie Miceli
_____

Joseph S. Diedrich, *PHV forthcoming*          Julie Miceli, *Trial Attorney*
HUSCH BLACKWELL LLP                                 Ohio Bar No. 0078257
1801 Pennsylvania Ave, NW, Suite 1000     HUSCH BLACKWELL LLP
Washington, DC 20006                                120 South Riverside Plaza, Suite 2200
202.378.2300                                            Chicago, Illinois 60606
                                                              312.655.1500
Kirsten A. Atanasoff, *PHV forthcoming*
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, Wisconsin 53703
608.255.4400

*Counsel to Plaintiff*